**[Cite as *State v. Compston*, 2024-Ohio-2192.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-47 |
| | : | |
| v. | : | Trial Court Case Nos. 22-CR-0788; 22-CR-0832; 22-CR-0890 |
| | : | |
| NATHANIEL COMPSTON | : | |
| | : | (Criminal Appeal from Common Pleas |
| Appellant | : | Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on June 7, 2024

. . . . . . . . . . .

TRAVIS L. KANE, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Nathaniel Compston, appeals from judgments in three criminal cases that were consolidated and tried together. The jury found Compston guilty on three felony counts of having violated a protection order. The trial court then sentenced Compston to 12 months in prison on each count, to be served consecutively, for a total of 36 months in prison.

{¶ 2} According to Compston, the verdicts were against the manifest weight of the evidence. However, Compston's argument addressed sufficiency of the evidence rather than manifest weight. Nonetheless, and for the reasons stated below, the verdicts were based on sufficient evidence and were not against the manifest weight of the evidence. Accordingly, the judgments of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} As noted, three criminal cases were filed against Compston. The indictments all alleged that Compston had violated a protection order, having previously been convicted of prior violations of such an order. The charges, therefore, were fifth-degree felonies. The alleged violations occurred on October 6, 2022, October 13, 2022, and October 24, 2022. After Compston pled not guilty, the court set various trial dates for each case (but ultimately consolidated the cases). Compston's appointed counsel filed a motion for funds to retain an expert witness in the area of cell phone forensics and examination, and on March 21, 2023, the court granted $2,500 for the expert.

{¶ 4} Subsequently, Compston's counsel filed a motion to withdraw, citing a breakdown in communication. The court then appointed new counsel on May 1, 2023, and on June 28, 2023, Compston moved to consolidate the three cases. The court granted the motion on August 17, 2023. Ultimately, a one-day jury trial on all three cases was held on August 23, 2023. During trial, the State presented testimony from the following witnesses: Deputy Anthony Reynolds of the Clark County Sheriff's Office; Sergeant Denise Jones of the Clark County Sheriff's Office; and L.B., the victim.

Compston testified on his own behalf.

{¶ 5} According to the evidence, L.B. had known Compston since she was around 16 years old.  They began a relationship when they were younger, broke up, and then later came back together, at which time they dated for about four years, beginning in 2017 and ending in 2021.  Transcript of Proceedings ("Tr."), 102 and 115-116.  After their relationship ended in 2021, L.B. found it necessary to obtain a domestic violence civil protection order ("DVCPO").  An ex parte order was issued in June 2021, and the DVCPO was then issued on August 17, 2021, after a full hearing at which Compston failed to appear.  The order was effective until June 23, 2026.  *Id.* at 73-74 and 103; State's Ex. 1, p. 2-3.

{¶ 6} Under the terms of the order, which included L.B. and her children, Compston was not to have any contact with the protected persons, including by "landline, cordless, cellular or digital telephone; text; instant messaging; fax; email; voice mail; delivery service; social networking; media; blogging; writings; electronic communications; or communications by any other means directly or through another person."  Ex. 1 at p. 4.

{¶ 7} L.B. testified that Compston had never abided by the terms of the 2021 DVCPO.  On September 22, 2022, Compston sent L.B. a picture of himself using a phone number ending with 7553.  Tr. at 110-111.  While L.B. and Compston were together, Compston used an "app" called "TextNow," which lets users send text messages without using cellphone service.  Compston showed L.B. how to use the app because they did not have cellphone service.  *Id.* at 107-108.

{¶ 8} The 7553 number was not the only number Compston used.  He used

multiple numbers to contact L.B, including a number ending in 4878. If L.B. received a call from a number she did not recognize, she would call back. If Compston answered, L.B. would hang up. If Compston did not answer, the app would say that the number was a TextNow subscriber and the call would go to voicemail. L.B. knew Compston was the caller because he was the only person she communicated with who used TextNow. However, when Compston found out that L.B. had blocked a number, he would get a new one. That is how TextNow works, and an individual can obtain a new number right away. When individuals sign up for TextNow, they provide an email address, and the app can generate a phone number that essentially cannot be traced. TextNow is not like a cellphone for which the police can obtain records. After getting a new number, Compston would then call L.B. again. *Id.* at 76-77, 105-106, 108, and 117-121; and Ex. 4.

{¶ 9} On September 23, 2022 (the day after Compston sent the photo), L.B. texted the 7553 number and asked Compston to quit doing "shit" in her Facebook. L.B. asked Compston why he kept trying to hurt her, and his response was "I'm not with someone. You are. I want to see you. Can I? I miss you." Compston never denied he was the person L.B. was talking with in that message. Tr. at 109-111 and State's Ex. 6.

{¶ 10} On October 6, 2022, Deputy Reynolds was working as a police officer for the Enon Police Department; he later became employed at the Clark County Sheriff's Department in November 2022. Tr. at 71-72. On October 6, Reynolds stopped by a gas station to get gas before his shift. During that time, Reynolds encountered L.B (who worked there) and asked how her day was going. At that point, L.B. told Reynolds about the protection order, stated she was not sure how to get Compston to stop contacting her,

and said she had repeatedly asked Compston to stop, but he would not. L.B. showed Reynolds text messages she had received that day from Compston while she was in Clark County. The messages were from a phone number ending in 4878. L.B. then emailed Reynolds screenshots of the texts for review. *Id.* at 72-73, 75-76, 77-78, and 104-106; and State's Ex. 4.

{¶ 11} In these texts, L.B. asked who the messages were from, and the sender replied, "It's nate this is my new phone." Tr. at 108 and Ex. 4. In the messages, there was a reference to a challenge. According to L.B., Compston had always told her that she would be nothing without him, would not be successful, and would not live without him. He had also challenged her during an argument to try and survive without him. In these text messages, L.B. was responding to that "challenge." Tr. at 106-107.

{¶ 12} After receiving L.B.'s information, Deputy Reynolds filed the first count of violation of a protection order. He then followed up with L.B. on October 13, 2022, to see if any new information had come through. At that time, L.B. said she had received further communications from Compston that day, while she was in Clark County. The messages were from the 7553 number that had been used in September 2022. L.B. told Reynolds that she had received messages earlier in the thread of the 7553 number; she then provided Reynolds with screenshots of the September 22 and 23, 2022 texts (regarding the picture and the discussion about Facebook). Tr. at 77-8, and 109; and State's Ex. 5 and Ex. 6.

{¶ 13} After comparing Compston's photo to his most recent driver's license and verifying with L.B. that the 7553 phone number was tied to Compston, Deputy Reynolds

filed another criminal charge of violation of a protection order. Tr. at 81-82. In considering the charges, Reynolds also determined that Compston had prior convictions for violating protection orders. *Id.* at 82-83 and State's Exs. 2 and 3 (certified copies of the prior convictions).

{¶ 14} Sergeant Jones testified that, since 2017, she had worked in the Intimate Partner Crime Unit, which investigates matters like domestic violence, stalking, protection orders, and some sexual assaults between intimate partners. According to Jones, TextNow is a means of obtaining transient phone numbers not necessarily provided through a cellphone provider, and they can be set up using email addresses, which are also transient. A phone number can be obtained and vanish, and a new number can be gotten within five minutes. Furthermore, TextNow only retains information for a limited amount of time. As a result, information about users can be very difficult to obtain if not done in a swift manner, i.e., within 48 to 72 hours. Jones also indicated that people in protection order and stalking situations commonly use apps like TextNow, especially when a victim is blocking numbers, because the victim will not recognize the number. Tr. at 89-93.

{¶ 15} In November 2022, L.B. reported to Sergeant Jones that she had received additional communications from Compston on October 24, 2022. These texts were also from the 7553 number, and L.B. received them while she was in Clark County. There were several text messages, but L.B. did not respond.

{¶ 16} Previously, in the September 23, 2022 text messages, Compston had referred to the fact that L.B. was with another person. *Id.* at 93-94, 112-113, 115, and

117; *see also* Ex. 6 and State's Ex. 7. The October 24 texts stated: "I miss you so much. I wanna kill him I seriously just might. I will I'm not even kidding Ur supposed to be mine." Tr. at 113 and Ex. 7. L.B. also believed these messages were from Compston because the sender said, "I'm Yellow Springs u don't even remember." *Id.* L.B. testified that while she and Compston were together, they talked about the future. One of their dreams was that they would live in a small house in a small town, and they both liked Yellow Springs. Tr. at 113.

{¶ 17} After speaking with L.B., receiving a screenshot of the October 24 texts, verifying the existence of the DVCPO, and checking Compston's prior criminal history, which indicated two prior convictions for the same offense, Sergeant Jones filed the third charge for violating the protection order. *Id.* at 95-96 and Exs. 2 and 3.

{¶ 18} Compston was the final witness and the only defense witness. Compston denied violating the protection order, denied using the phone numbers on the text messages, denied sending text messages to L.B., and denied that he had sent L.B. a photo. According to Compston, the photo had been taken about four years earlier, and he had probably put the photo on Facebook, where anyone could have accessed it. He admitted having a TextNow account but said he had not used it for two years. Tr. at 125-130. Compston further stated that he had never received any text messages from L.B. and that, after a probation violation the previous year, he had obtained a new phone The number for this phone ended in 9669, and L.B. never had that number. *Id.* at 131.

{¶ 19} During cross-examination, Compston admitted that he had, in fact, violated L.B.'s protection order and that the violation was one of the prior convictions the State

had presented. *Id.* at 132. In addition, Compston admitted that a TextNow number does not have to be attached to a particular phone provided by a carrier like Verizon or T-Mobile; it can be attached to a phone number, to Facebook, or to an email address. *Id.* at 134-135.

{¶ 20} After hearing the evidence, the jury found Compston guilty as charged, and the court set sentencing for August 28, 2023. At the sentencing hearing, the court imposed a total prison sentence of 36 months. After the court filed its judgment entries, Compston timely appealed.

## II. Manifest Weight

{¶ 21} Compston's sole assignment of error states that:

> All Counts Must Be Reversed Because They Are Against the Manifest Weight of the Evidence.

{¶ 22} Under this assignment of error, Compston actually does not argue manifest weight of the evidence, but he contends his convictions were not supported by sufficient evidence. His argument is based on the fact that the text for the September 2022 photo was undated and could have been sent at any time. Compston further contends that the police failed to investigate whether any email addresses or phone numbers that belonged to him were registered with TextNow.

{¶ 23} The standards for sufficiency and manifest weight are well-established. "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the

verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted.) *Id.* at paragraph two of the syllabus.

{¶ 24} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this situation, a court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord State v. Drummond*, 111

Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193.  "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."  *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 25} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency."  (Citations omitted.)  *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11.  *Accord State v. Crawl*, 2d Dist. Montgomery No. 29859, 2024-Ohio-752, ¶ 18.  Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency."  (Citations omitted.)  *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 26} Furthermore, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility.  The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."  *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 27} In the trial court, Compston was indicted for three violations of R.C. 2919.27(A)(1), which provides that: "No person shall recklessly violate the terms of any

of the following: * * * A protection order issued or consent agreement approved pursuant to section 2919.26 or 3113.31 of the Revised Code." The level of the offense is increased from a first-degree misdemeanor to a felony where a defendant has previously been convicted of a prior violation of a protection order issued under R.C. 3113.31 or has been convicted of one or more violations of R.C. 2919.27. *See* R.C. 2919.27(B)(3)(a) and (c).

{¶ 28} There was no dispute in this case that a protection order had been issued to L.B. pursuant to R.C. 3113.31, or that Compston had previously been convicted twice for violating protection orders. *See* Ex. 1 at p. 2 (noting the DVCPO was issued under R.C. 3113.31) and Tr. 132-133 (where Compston admitted he had previously been convicted of violating the 2021 DVCPO as well as another protection order that was issued in 2016). Thus, the only question at issue was whether Compston had recklessly violated the DVCPO.

{¶ 29} R.C. 2901.22(C) states that:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 30} Given that Compston had already been convicted of violating the DVCPO,

he was certainly aware of the order, would have known of the consequences of disregarding it, and would have acted recklessly if he contacted L.B. Therefore, the only issue is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found" that Compston had violated the order. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus. Our review of the evidence recited above reveals the proof was more than sufficient.

**{¶ 31}** L.B. testified about the three contacts (and actually more that were not charged) and provided screenshots of contacts on the dates in question. In addition, L.B. testified that Compston had previously used the text messaging app, that he was the only person she communicated with who used it, and that Compston used multiple phone numbers, including the numbers in question. After the protection order was issued, L.B. had on various occasions missed calls from Compston on numbers she did not recognize. When she called back, the call would be from Compston, or if he did not answer, the voicemail would say that the call was from a TextNow subscriber. L.B. also connected specific content in the text messages to things that had occurred during her prior relationship with Compston. Tr. at 105-114, and 117-123. Finally, L.B. stated there was no doubt in her mind that all the messages were from Compston. *Id.* at 119-120. Under the circumstances, a rational fact-finder could have found that Compston had violated the DVCPO.

**{¶ 32}** Furthermore, even if we were to consider the manifest weight of the evidence, while Compston denied any violations, the jury was entitled to weigh credibility and to believe L.B.'s testimony. The State was also not required to contact TextNow.

There was no indication that TextNow requires anything other than an email address to obtain a phone number for texting purposes. This would not necessarily connect a subscriber with a verifiable identity. In other words, an individual could use many different email accounts to obtain phone numbers from TextNow, and email addresses often do not contain a user's actual name. The police did not need to conduct this kind of laborious investigation (with no real chance of success) when the proof was already more than adequate to prove the State's case.

**{¶ 33}** Based on the preceding discussion, Compston's sole assignment of error is overruled.

### III. Conclusion

**{¶ 34}** Compston's sole assignment of error having been overruled, the judgments of the trial court are affirmed.

. . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.